J-S13031-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: T.D.T., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.A., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2336 EDA 2020 |

Appeal from the Order Entered December 14, 2020
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000811-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: L.L.T., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.A., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2337 EDA 2020 |

Appeal from the Order Entered December 14, 2020
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000812-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: K.D.T., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.A., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2338 EDA 2020 |

Appeal from the Order Entered December 14, 2020
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000813-2019

J-S13031-21

BEFORE:  OLSON, J., KING, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                **FILED JUNE 09, 2021**

In these consolidated cases, J.A. (Mother) appeals from the orders entered on December 14, 2020, in the Court of Common Pleas of Philadelphia County (trial court) granting the petition filed by the Philadelphia Department of Human Services (DHS) to involuntarily terminate Mother's parental rights to minor children, T.D.T. (d.o.b. October 2016), L.L.T. (d.o.b. April 2018), and K.D.T. (d.o.b. April 2015) (collectively, Children), pursuant to the Adoption Act, 23 Pa.C.S. § 2511 (a)(2), (5), (8) and (b).[1]  We affirm.

**I.**

**A.**

DHS became involved with this family on July 7, 2018, when it received a Child Protective Service (CPS) report alleging that Father assaulted K.D.T. resulting in a hemorrhage, as well as bruising to the left sides of his chest, back and eye and his right rear.  Further medical evaluation of the three Children revealed that T.D.T. also had recently suffered a rib fracture and broken arm and K.D.T. had additional bruising over his trunk, abdomen, genitals and extremities, as well as a liver contusion with fluid in his abdomen.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Father's parental rights to Children were involuntarily terminated on February 23, 2021.  He is not a party to this appeal.

- 2 -

The injuries were deemed consistent with child abuse and K.D.T.'s injuries were classified as a near fatality. DHS indicated the report against both parents.

On July 8, 2018, DHS received two additional CPS reports that revealed three-month-old L.L.T. also had multiple healing rib and spleen fractures, a liver laceration and a possible right femur fracture. The injuries were classified as a near fatality. DHS further learned from the Special Victims Unit (SVU) that T.D.T. told his maternal grandfather that Mother caused his injuries. DHS founded the reports against both parents. On July 12, 2018, DHS took protective custody of Children after medical tests determined that their injuries were the result of non-accidental trauma consistent with abuse.

On December 3, 2018, the trial court adjudicated Children dependent, committed them to DHS custody, found child abuse and aggravated circumstances against Mother and Father and suspended visitation pursuant to its finding of grave threat. It also referred Mother for a Parenting Capacity Evaluation (PCE), to Behavioral Health Systems (BHS) for a mental health evaluation and treatment monitoring, to the Clinical Evaluation Unit (CEU) for drug screens and drug and alcohol assessment, and to the Achieving Reunification Center (ARC) for parenting and housing services. The trial court founded the CPS reports against both parents. (**See** N.T. Termination of Parental Rights (TPR) Hearing, 12/14/20, at 10).

At regularly held permanency review hearings, the court found Children's placement continued to be necessary and appropriate, that DHS made reasonable efforts to finalize Children's permanency plans, and that visitation with Mother should remain suspended due to the ongoing grave threat that she presented. The trial court regularly referred Mother to BHS for assessment and drug screenings, which continually came back positive for marijuana.

**B.**

DHS filed a petition for termination of parental rights in October 2020. By the time of the December 14, 2020 hearing, two-year-old L.L.T., four-year-old T.D.T. and five-year-old K.D.T. and had been in care for 29 months. DHS presented the testimony of Community Umbrella Agency (CUA) case manager, Tamika Bond, and expert witness and forensic psychologist, Dr. William Russell. Mother testified on her own behalf and was represented by counsel.

**1.**

Ms. Bond testified that the CUA established single case plan (SCP) objectives for Mother that remained the same throughout the life of the case and included (1) completion of the PCE; (2) mental health treatment; (3) drug and alcohol treatment; (4) obtaining housing and employment; (5) parenting evaluation and treatment; and (6) visitation when appropriate. One of Mother's primary goals was to "address her role and responsibility in the injuries of all three children," which Ms. Bond did not believe Mother

understood because she did not engage in therapy. Instead, Mother said that "she didn't have a role, basically, that the dad did everything and it … shouldn't … be on her … it has not been addressed about how she played a part in this situation." (N.T. TPR Hearing, at 41, 54).

Ms. Bond explained that Mother had been court-ordered to address mental health throughout this entire case and had been referred for at least four BHS assessments, but that Mother's failure to comply with the mental health objective, despite Ms. Bond's regular efforts to inform her of the importance of therapy and medication management for reunification, was the primary barrier to resolving the Children's dependency issues. Between October 2019 and December 2020, Mother did not engage in any mental health treatment to address her post-traumatic stress disorder (PTSD), depression or role in Children's injuries. Despite making overtures toward enrolling in therapy, she failed to timely follow through. For example, she completed intake at Merakey for inpatient mental health treatment in October 2019, but never returned for services, resulting in her discharge for non-attendance. When Mother claimed she could not get in touch with anyone at Merakey for treatment, Ms. Bond recommended a different facility, Warren E. Smith (WES). Mother completed intake at WES approximately one week before the TPR hearing.

Ms. Bond testified that Mother's drug of choice is marijuana and that all eight urine screens during this litigation have come back positive for cannabis.

Mother has attended some substance abuse counseling through Merakey since September 2019. While she was supposed to attend weekly sessions, she claimed that she could not always get in touch with her counselor. Although Mother eventually obtained a medical marijuana card, it was not prescribed by Merakey or any agency affiliated with or monitored by CEU or BHS.

Ms. Bond gave Mother credit for completing housing and parenting courses through the ARC and noted that she obtained a short-term lease for a three-bedroom home in September 2020. She also had held employment at a gas station for two months at the time of the hearing. Prior to that she had worked at a chain restaurant and a retail store but had ceased working in 2020 due to the Covid-19 pandemic.

Although Mother expressed interest in visiting with Children approximately every other month, CUA could not recommend contact where she struggled to engage with therapy and medication management. Ms. Bond also was concerned that Mother did not ask about Children's routine appointments or developmental milestones. Although Mother completed the PCE, the report from the parenting evaluation stated that there were concerns about Mother's ability to provide safety for Children because she did not understand her role in their injuries.

Ms. Bond testified that Children had resided in the same pre-adoptive, kinship foster home since their initial 2018 placement. The kinship home parent is very involved in their care and ensured that their needs, such as

specialized services like T.D.T.'s and K.D.T.'s trauma-focused therapy for the near fatal injuries and abuse they had suffered, were met. They were all up-to-date with their medical and dental appointments. Children look to their kinship caregiver as their primary caregiver and parental figure and have a strong bond with her. She is a pre-adoptive resource.

Conversely, none of Children have a relationship with Mother, do not recognize her as a parent, ask about her or mention her. When Ms. Bond asked T.D.T. and K.D.T. if they wanted to see Mother, they said no and that their kinship parent was their "mom." Ms. Bond testified that they would not suffer irreparable harm from the termination of Mother's parental rights and that, because Children could not be safely reunified with Mother, Ms. Bond believed that it would be in their best interest to change their permanency goals to adoption.

**2.**

Dr. Russell, forensic psychologist and expert witness in the field of PCEs, evaluated Mother's ability to provide a safe, permanent environment for a child to develop normally. He concluded to a reasonable degree of psychological certainty that Mother did not have the capacity to provide safety and permanency for Children due to her "long history of unstable development," her "dependence on marijuana," her diagnosis of "[PTSD] and depressive disorder" and her history of unstable housing and employment. (***See id.*** at 64-66).

He explained that at her clinical interview, Mother did not display any insight into her role in Children's injuries despite the importance that she understand that something went wrong and that she was not able to keep Children safe. He opined that it is crucial for Mother to get into mental health treatment for PTSD and to provide her insight into her role and responsibility in Children's trauma, but that she has never substantially participated in her mental health treatment. He stated that despite Mother being issued a medical marijuana card, this would not be sufficient to address her mental health concerns. Only after six months to a year or longer of sustained therapy would it be possible to know if she were making any progress, and until her mental health were demonstrated, she should continue to not have any contact with Children.

**3.**

The parties stipulated that Mother was diagnosed with PTSD and depression on March 18, 2019; that she has been attending substance abuse treatment at Merakey since September 9, 2019; that she had a current lease for the period of September 1, 2020, through May 31, 2021; and that she was authorized for her medical marijuana card after she had been diagnosed with depression and PTSD.

Mother confirmed that she worked full-time at a gas station and expressed a desire to stop using marijuana because she wanted better for Children. She testified that she had problems getting through to Merakey for

mental health treatment during Covid-19 and that before Covid-19, she delayed seeking treatment sooner than October 2019 because it was difficult to manage a job, treatment and locating a place to stay, but that she had a place to live at the time of the hearing, so it would be easier. After her October 2019 mental health intake at Merakey, she did not return because she was "juggling work." However, she admitted she stopped working at the restaurant in November 2019 and at her retail employer in March 2020. She did not attempt to connect with mental health treatment again until December 4, 2020, approximately one week before the TPR hearing, when she did an intake with W.E.S. Mother asserted that at the time of the hearing, nobody had gotten back to her about an appointment because they are also backed up due to the pandemic.

The court found clear and convincing evidence to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8) and (b) and change Children's goal to adoption. Mother timely filed a notice of appeal and concise statement of matters complained of on appeal arguing that the court abused its discretion in terminating her parental rights where she has remedied her situation by maintaining housing, taking parenting classes and

intensive drug treatment and the Children have a close bond with her.[2] *See*

Pa.R.A.P. 1925(a)(2)(i), (b).

## II.

## A.

Section 2511 of the Adoption Act governs the involuntary termination of

parental rights and requires a bifurcated analysis:

> ... Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re Adoption of B.G.S.*, 240 A.3d 658, 662-63 (Pa. Super. 2020) (case

citation omitted).

---

[2] We review the trial court's order for an abuse of discretion. *See In re G.M.S.*, 193 A.3d 395, 399 (Pa. Super. 2018) (citation omitted). Moreover, "[w]e give great deference to trial courts that often have first-hand observations of the parties spanning multiple hearings." *In re Interest of D.F.*, 165 A.3d 960, 966 (Pa. Super. 2017). "We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence." *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re A.S.*, 11 A.3d 473, 477 (Pa. Super. 2010). "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *Id.*

The trial court terminated Mother's parental rights pursuant to Section 2511(a)(2), (5), (8) and (b) of the Adoption Act. Instantly, we conclude that the record supports the order pursuant to Section 2511(a)(2) and (b), which provides:

> **(a) General rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>        *    *    *
>
>     (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
>        *    *    *
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2)and (b); *see also **In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*) (stating that we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm).

**B.**

In a termination proceeding, the moving party must produce clear and convincing evidence with respect to the following elements to terminate parental rights pursuant to Section 2511(a)(2): (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003).

Pursuant to Section 2511(a)(2), parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.*, 797 A.2d 326, 340 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* The grounds for termination of parental rights under Section 2511(a)(2) due to parental incapacity that cannot be remedied are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. *Id.* at 337.

Applying these principles, the court found that termination under subsection 2511(a)(2) was appropriate, explaining:

- 12 -

Mother has been moderately compliant with her SCP objectives. Mother had made moderate progress towards resolving the ongoing dependency issues. Children need safety and permanency, which Mother cannot provide. Mother has failed to consistently engage with her objectives for the life of the case, most notably her mental health and drug and alcohol programs. Mother's parenting capacity to keep Children safe and to provide for their present and future needs is diminished, due to her lack of positive affirmation to engage and successfully complete a dual diagnosis program. Mother's lack of consistent engagement has affected her ability to reinstate her supervised visits with Children. At this time, Mother is unable to create a relationship and a beneficial parental bond with Children. Consistent engagement with her objectives for a period of at least six months would be necessary to safely reinstate any form of visitation between Mother and Children. Mother's objectives have remained the same for the life of the case. Mother has demonstrated that she is unwilling to remedy the causes of her incapacity to parent and provide Children with essential parental care, control, or subsistence necessary for [Children's] physical and mental well-being.

(Trial Court Opinion, 3/04/21, at 10).

It is undisputed that Children, aged five, four and two, had been in foster placement for 29 months at the time of the TPR hearing. DHS also presented clear and convincing evidence that the conditions that led to the Children's placement continue to exist.

Specifically, Ms. Bond testified that Mother's SCP has remained the same throughout the life of the case and included, *inter alia*, drug and alcohol and mental health treatment. While Mother has been in the care of Merakey for drug and alcohol treatment since September 2019, all eight of her drug screens during the life of this case have come back positive for marijuana and she has only sporadically attended drug and alcohol counseling, although she

is supposed to attend weekly sessions. (*See* N.T. Hearing, 12/15/20, at 24-25, 31-32, 57-58). Furthermore, despite Ms. Bond crediting Mother for obtaining employment and housing, Mother's failure to comply with the mental health objective, despite Ms. Bond's informing her of its importance for reunification, was the primary barrier to her resolving Children's dependency issues. (*See id.* at 25-26).

Mother failed to engage in mental health treatment to address her PTSD, depression or role in Children's injuries between October 19, 2019, and December 2020. (*See id.* at 31, 35, 40-41). Dr. Russell testified that Mother failed to display any insight into her role in Children's injuries despite the importance of her understanding that she failed to keep them safe. (*See id.* at 72-73). Ms. Bond and Dr. Russell testified that she should have no contact with the Children until **all** her goals were met and that it would require six months to a year or longer of sustained therapy to determine if she was making any progress. (*See id.* at 48, 50-52, 71).

Thus, DHS provided clear and convincing evidence that due to Mother's continued incapacity, she is unable to provide Children with essential care necessary for their physical and mental well-being, which cannot be remedied without her committing to mental health treatment, which she has failed to do for the life of this case. The trial court did not abuse its discretion in finding that DHS presented sufficiently clear and convincing evidence to support termination pursuant to Section 2511(a)(2).

**C.**

Having determined that the court properly found that termination of Mother's parental rights was appropriate under subsection 2511(a)(2), we now consider whether termination is in Children's best interest pursuant to subsection 2511(b).

> With respect to Section 2511(b), our analysis focuses on the effect that terminating the parental bond will have on the child. In particular, we review whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. It is well settled that intangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child.
>
> One major aspect of the "needs and welfare" analysis concerns the nature and status of the emotional bond that the child has with the parent, with close attention paid to the effect on the child of permanently severing any such bond. The fact that a child has a bond with a parent does not preclude the termination of parental rights. Rather, the trial court must examine the depth of the bond to determine whether the bond is so meaningful to the child that its termination would destroy an existing, necessary, and beneficial relationship. Notably, where there is no evidence of a bond between the parent and child, it is reasonable to infer that no bond exists.
>
> It is sufficient for the trial court to rely on the opinions of social workers and caseworkers when evaluating the impact that termination of parental rights will have on a child. The trial court may consider intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.

***Int. of K.M.W., supra*** at 475 (case citations and most quotation marks omitted).

Mother argues that termination of her parental rights is not in the best interest of Children because they lived with her for the first part of their young lives and they never were asked if they were okay with not seeing her again.

However, the court found that:

Children would not suffer any irreparable harm if Mother's parental rights were terminated. Children would suffer harm if they were removed from their current adoptive placement and reunified with Mother. The record establishes by clear and convincing evidence that termination would not sever an existing and beneficial relationship between Mother and Children. The DHS witnesses were credible. …

(Trial Ct. Op., at 20).

The evidence supports the trial court's conclusion that terminating Mother's parental rights is in Children's best interests. Ms. Bond testified that Children had not had any visitation from Mother since the case's inception approximately 29 months prior to trial when she was found to be a perpetrator of child abuse with aggravated circumstances because, since then, Mother has been unwilling to consistently engage in mental health and drug and alcohol programs, prerequisites for lifting the visitation suspension. Ms. Bond explained that Children have no bond with Mother and are closely bonded with their foster, pre-adoptive parent, who provide for their daily needs and whom two of the Children specifically refer to as their "mom" when asked if they want to see Mother. She testified that there would be no irreversible harm caused by terminating Mother's parental rights. She and Dr. Russell opined that because Children could not be safely reunited with Mother, it was in their

best interest to involuntarily terminate Mother's parental rights and change their permanency goals to adoption.

Hence, the record supports the trial court's finding that DHS established that the termination of Mother's parental rights would best serve Children's interests and we find no abuse of discretion in its decision to terminate Mother's parental rights to Children and to change their goal to adoption.

Orders affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 6/9/2021*